Good morning, and may it please the court. Here today on behalf of Federal Insurance Company, Federal provided a first layer of excess insurance coverage to Donaldson in three of the five policy periods in which trucks with Donaldson air intake ducts were physically damaged. We're asking this court to reverse the district court's unreasonable interpretation of the underlying insurance policies, an interpretation that lumped that five years of property damage into a single policy period, shifting millions of dollars of risk onto federal in a way that was not and could not have been anticipated during the underwriting process. Now today, I'd like to focus on the issue of which policies are triggered by the damaged trucks, and if time permits, also address why there are a minimum of four lots of air intake ducts, resulting in four separate occurrences. As always, I'm happy to answer the court's questions on either topic at any time, however. So I'd like to start with the AIG policies, and when I say AIG, I'm referring collectively to Appellee's National Union and American Home. And before we talk about the badge clause endorsement, I think it's important to start with the insuring agreement itself. Now the terms of the insuring agreement are not disputed in this case. And the insuring agreement is the very first section in the AIG policies, and it says what is the risk that is being insured. Well, the risk that is being insured is the risk of property damage. And the insuring agreement sets out what two conditions apply in order for that risk to be covered. Well, first, and this is in section 1B on page 7 of our brief, 1B1 is a question of causation. The property damage has to have been caused by an occurrence. And then the second requirement is a question of timing. The property damage has to actually happen during the policy period. Property damage is a defined term in the policies, and as relevant to this case, it means physical injury to property. So the question in this case fundamentally is did the badge clause endorsement somehow change what it means to be property damage, or when it has to happen in order to be covered by the policies? Excuse me a moment, counsel. In reading the district court's first opinion, which I think is really what's at issue here in this case, maybe I'm wrong, but it seems to me the district court read the last sentence of the badge clause as though it said such physical damage or such property damage will be deemed to occur with the first injury. And that's not what it says. It says such occurrence. So isn't that, am I right in thinking that's the way the court construed that clause? We absolutely agree that that is the way the court construed that clause, and that is what Donaldson is asking you to interpret that clause to mean in this case. So what work does that clause do if it doesn't mean what the district court said it means? Does it refer to this B, loss of tangible property that's not physically damaged? So the work that it does is it defines when an occurrence happens. And again, the badge clause endorsement is clear that the only definition it is modifying is the definition of occurrence. And an occurrence and property damage can and often do happen in different policy periods. But the occurrence, the timing of the occurrence matters under the policies. Apart from, it doesn't trigger coverage, but it matters. It matters for Donaldson's notice obligations. Donaldson has certain obligations once it has notice of an occurrence. And also, if the type of property damage at issue in a case were loss of use, well, loss of use property damage. That's the B part. Correct. That's not an issue here. That is not. Okay, so this clause, assuming that the district court got it wrong and construing it, isn't just dangling you there and doing no work. It does work. It absolutely does work. It matters when the occurrence happens. But it doesn't matter for triggering coverage. I understand. Yeah. Thank you, Your Honor. Trying to make sense of it. Absolutely. And I think what is confusing in both the district court's decision and the briefing is there is this attempt to conflate property damage and occurrence. But they are fundamentally different concepts in insurance law. And more importantly, because what matters is the plain text of the contract, they're different concepts in the contract itself. It's clear that there is a causal relation between the two. The occurrence is separately defined as the accident. And that accident has to cause property damage. But they don't happen at the same time. They are separate events. Both are necessary in order to trigger coverage. But only one actually triggers coverage during the policy period, and that's the property damage. It has to occur during the period. Correct. The property damage has to actually happen. If you're right, and I'm not saying we think you are, but what should we do about it besides reverse? I mean, what happens? Is there some alternative solution to this difficulty that you can offer us that we could incorporate in a finding or a holding, or do we need to just remand and start over? Well, I believe that the court would reverse and remand with instructions to the district court to allocate the $6 million settlement that's issued across each policy period that was triggered. According to when the damage occurred, is that it? Correct. And there was never findings below on when the damage occurred? Of each claim, is that it? Correct, because it didn't, under the district court's interpretation in the very first case, it didn't matter when the damage occurred. So there is evidence in the record. And let's just take an example of a specific policy period. So there is evidence in the record that there are 48 trucks that are damaged by these defective air intake ducts. Let's take the 2001-2002 policy period. In that policy period, there is evidence that there were 14 trucks that were damaged. Let's say that each damaged truck, or that there are two lots of goods that give rise to those 14 damaged trucks. What it means is that in each separate policy period, Donaldson would pay one deductible per lot, per occurrence, but then all of the property damage that happens in that policy period is covered under the policy period. So the damage to the 14 trucks would all be covered during the 2001-2002 policy period, and then whatever is beyond the deductibles would be covered by the first layer of insurance coverage, and I believe in that year, or the first layer is provided by AIG, and then if there is any additional recovery allocated to that year, that would be attributed to the excess insurer, who actually in that year was also AIG. We weren't the excess insurer in that policy period. And there are examples of cases where this court has done that, has said there is one occurrence, it gives rise to property damage in multiple years, and so what that means is that the policyholder pays one deductible per occurrence in each policy period that's triggered, but each policy only covers the damage that actually happens during the policy period, and that's what this court did in Diocese of Winona, and it's also the approach that the court took in the Diamond Shamrock case that is cited by Donaldson, that is the case where there was a single occurrence that was the distribution of Agent Orange, but it resulted in physical injury to service men and women over a period of years, and the court said, okay, and I'm quoting, one deductible would be applied against the losses on each of the primary policies, which were triggered. So there's one deductible because there's one occurrence, but that applies in each separate policy period, and then the physical damage or physical injury is covered just for the policy period in which the physical damage occurs. If I may, I'd like to also move on to the federal excess policy, unless the court has any other questions on our interpretation of the AIG policies. So if you look at the excess policy, even if this court were to conclude that the badge clause endorsement somehow changes when property damage happens, then we believe that there would be an express conflict between the AIG policies and federal's excess policy, and federal's policy is clear that in the case of such an express conflict, it is federal's policy that would control, and federal's policy, like the AIG policies below, only covers injury that happens during the policy period. That is the risk that is being insured. So if this court were to conclude that the badge clause endorsement changes the AIG policies so that those policies cover risk for property damage outside of the policy period, then there would be an express conflict between the two, and it would be AIG federal would only cover damage in excess of the 1999-2000 policy period for trucks that were actually damaged during that year. I'd like to briefly address the lot issue, unless the court has any other questions on which policies are triggered. So I just want to be clear that we're not challenging the Webster definition of lot that the district court adopted in Donaldson 1. Instead, we're challenging the district court's modification of that definition in Donaldson 2, where the district court said that a change to base material that otherwise would have constituted a unique product such that there is a different lot was not actually a change for purposes of there being a new lot because the change didn't matter for the purposes of this litigation. And that's simply not what the lot definition says. It doesn't batch products by defect. It batches products by production group. It batches products based on whether the products are identical. So we believe that there are a minimum of four lots because the district court concluded that there was a change in base materials and simply disregarded that change because the change wasn't relevant to the product defect litigation. But that is inconsistent with the district court's own definition of the term lot. Unless the court has any further questions, I'll reserve the remainder of my time for rebuttal. Well, thank you. Mr. Kilby. Thank you, Your Honor. Proceed. Matt Kilby on behalf of defendant in Appellee Donaldson Company. Donaldson is the insured party in this insurance coverage case. I want to start with the practical implications of this dispute because that is often lost in federal's briefing. What is at issue for Donaldson, what's at issue in this case, is the number of $500,000 deductibles that Donaldson was required to pay before its carriers would pay the remainder of a $6 million settlement of a products liability case. The product liability case underlies this insurance dispute. It related to two products, two air duct products that Donaldson sold called parts 317 and 319, both of which Donaldson first learned had caused damage to trucks, logging trucks in the southeast in January 2000. The district court here reviewed a summary judgment record that was at that point five years in the making. It held after review of that record that the number of deductibles was two, relating to two lots of products, one for each part, one for 317, one for 319, and that ties out to two occurrences under the policy. We believe that decision should be affirmed. Now, federal doesn't clearly state in its briefs how many $500,000 deductibles it thinks Donaldson should pay, but its argument for the trial court was that there were 22 lots and 22 occurrences. And, of course, the point of that is to make cover illusory here. It's theoretically a covered claim after you pay 22 $500,000 deductibles. I want to make three primary points, one regarding the batch clause and the proper construction the district court gave it, the second relating to the excess policy issue, and the third relating to the number of lots. With respect to the batch clause endorsement, I think it's important at the outset to realize that this is a limited endorsement that applies to a specific type of property damage. That's in the first clause of the batch clause endorsement. It applies to products completed operations hazard, and that is a technical insurance term for what we all know of as products liability cases, and that's all it applies to is products liability cases. If you look at the definition of products completed operations hazard and underlying policy, that's the import of it. And with respect to that type of property damage, which is product liability cases, the batch clause does two things, one in each sentence. It was the second sentence that was the subject of your question this morning, Judge Arnold, but it's the first sentence that I want to start with because under both sentences, Donaldson wins and the district court should be affirmed. Because what the first sentence does is it deems all property damage, all property damage relating to a single lot, a single lot of goods, as resulting from a single occurrence, and that's whenever the damage occurs. And that's important because one occurrence means one deductible. Under the plain language of the batch clause, there is not, in that first sentence, there's not a policy year limitation. If one lot causes damage in three different years, it's still one occurrence, one deductible, because there's no limitation, there's no policy or limitation in that first sentence of the batch clause. Let me ask you a practical, physical question. When is it and what is it, when is it that this occurrence occurs? What is the occurrence? So under Minnesota law, Your Honor, Minnesota follows the actual injury test for when an occurrence occurs, okay? The actual injury test is when the injury manifests itself when it causes harm. So here the occurrence is causing the harm, the occurrence occurs at the point that the truck's engine stopped working in this case. You mean the occurrence concurs with the physical injury? That's exactly right, Your Honor. It doesn't make a lot of sense if you conflate cause and effect. I mean, because they're often separate, right? They can be separate. And federal cites a number of cases where that typically, I'll tell you, in most cases, in nine cases out of ten, the occurrence occurs at the exact time the injury manifests itself. And so there is no daylight between the two. That's nine out of ten cases under Minnesota's actual injury test as discussed in the silicone litigation cases discussed in the Singus case from the Minnesota Supreme Court, that both sides cite. Nine out of ten cases, the actual injury test means that the occurrence occurs at the exact point that the damage manifests itself. So that's why you think these two mean the same thing here. Well, and under the- The occurrence and damage are the same, is that it? Well, under the first clause, that's exactly what the first clause does. There are cases where there's hypothetically a distance between the two. And in Minnesota, those tend to be pollution cases. Yeah, that's what I'm saying. The other case is a negligent- Well, you could say that the occurrence occurred here when the defect was baked into the product. Under the Minnesota actual injury test, that's not the case. And if you look at the silicone cases from Minnesota Supreme Court that both sides cite- I just, yeah, it's a confusing point. It is, but in nine out of ten cases, it's the manifestation of the injury that is the time of the occurrence. That's helpful. This is not a pollution case. This is not a negligent supervision case. Those cases that they cite are the exceptions to the rule where you're dealing with something very complicated like pollution. This isn't complicated. The truck's engine stopped working. We've got a definitive point, and the Minnesota Supreme Court says when you've got a definitive point of injury, that's the point of your occurrence. And lest there be any confusion in this case, the first sentence of the Batch Clause makes that crystal clear because it says all property damage relating to one lot shall be deemed result from a single occurrence. And then in the second sentence of the Batch Clause, it deems the occurrence of damage to take place at the same time that the insured receives notice of injury. And you have to look carefully at that sentence. It says such occurrence, and it's cited at page 20 of our brief, and it's in the appendix at page 336. Such occurrence will be deemed to occur with the first injury notified to you during the policy period. Well, such occurrence refers to the first sentence, which is an occurrence of property damage relating to one lot. See, the occurrence of property damage relating to one lot, that's the such occurrence. That occurrence of property damage relating to that lot is deemed to occur with the first injury notified. And the first injury notified, the court found, was during the 99-2000 policy period, and there's no dispute about that. You're saying that this essentially says that for purposes of coverage, it does occur during the policy period? Correct. So where you have your first notice of injury, here that was in January 2000. Then if there is future injury that occurs in future years, all that injury, so long as it's relating to the same lot of goods. Aggregated. Is aggregated, is deemed to have taken place in the first period. Because the purpose of a batch clause, or what a batch clause does, is to lessen occurrences and trigger fewer policies. When you have a product defect, you have complaints or a product manufacturing issue, or for whatever reason your product has gone out in the market and caused harm, rather than having one occurrence for each consumer complaint, and then multiple years in the policy triggered, they're grouped by the lot, by the damage relating to one lot of goods. Okay? And it's deemed to be one occurrence, and that occurrence then is deemed to occur, is the second sentence, in the year that you received the first notice of injury. With respect to the excess policy, these are follow-form policies. They literally say on the first page in the introduction, this is a follow-form policy. And the policy says it follows form unless there's a contrary provision. The only provision they pointed to as contrary is a provision in the excess policy that says, property damage must take place in the policy period. That's obviously not contrary, and Federalist Council started by reading the same provision that's in the AIG policy. So you can't hang your hat on a contrary provision that appears almost identically in the underlying policy, which is why the excess follow-form argument just doesn't hold water. On the final point, Your Honor, with respect to the number of lots, that's really decided at the level of the definition. And what the district court found is that the definition that it applied was that the lot meant each type of unique product, as a distinct group, kind, or sort, unique product. And there's no dispute in this case that there were two unique products, 317 and 319. And we submit that the full weight of the summary judgment record supported the court's finding as to the number of lots in this case. With that, I'd like to turn over the rest of the time to counsel for AIG. May it please the court. My name is Cody Moon, and I am counsel for the two AIG entities, National Union Fire Insurance Company of Pittsburgh, PA, and American Home Assurance Company. For the purpose of today's argument, we have ceded most of our time to Donaldson, and they've done a good job of explaining to the court and addressing the court's inquiries on most of the issues raised by this case. But there is one thing in particular that I would like to expand on. Let me ask you just a background question, just to fully understand the factual background here. Is this a situation where these insurance companies, when the settlement was reached, just agreed to fund the settlement and then litigate the actual apportionment later? Yes, that's correct, Your Honor. We reserved rights as to each other and as to Donaldson and agreed to litigate the allocation issue. All right. So the one issue I would like to address is the alternative argument raised by federal with respect to whether or not their policy is a follow-up form given the court's interpretation. As specifically stated by federal in their opening argument, they are assuming that if the batch clause endorsement is interpreted to deem property damage, as the district court has done, then there is a conflict with their policy. If we take their alternative argument at its face value and make the same assumption that they're making, there is no conflict between the excess federal follow-up form policy because what has happened is that the batch clause endorsement's definition of occurrence has deemed property damage. That's the exact assumption they're asking the court to make. At that point in time, the question of whether the federal policy applies to property damage during the policy period is still actively being enforced. So if the court interprets the batch clause endorsement to deem property damage to be at X point in time, the first notice of injury, in this case that was found to be January of 2000, if that is accurate, that that is the deeming of property damage, then the question becomes, is the property damage during federal's policy period? Once deemed, that's final. That's determined for purposes of that definition. Once deemed, then the question is, which federal policy, which excess policy applies? Is it the 99-2000 policy where the court placed it? Or is it the 98-99 or the 2000-2001? To determine which one it applies to, the court looks to the federal insuring agreement and says, where is the property damage? When did it take place? And there, the court has now deemed by their very assumption the policy, the property damage took place January of 2000. Therefore, that is the specific triggered policy. It's not any more complicated than that. It's a simple issue of one thing says when the property damage happened, the other determines based on whenever the property damage was, this is the policy that's in play. Again, it's only under federal's alternative argument that there's not a follow form provision, that they are making this assumption. And under that assumption, that's how this court should decide. Again, we believe that Donaldson has properly addressed the remainder of the questions. And with that, we would ask the court to affirm the district court decision. Thank you. Thank you, counsel. How much time does the appellate have left? Three minutes, 34 seconds, your honor. So what was the occurrence in this case? That is not disputed. The occurrence was when the district court deemed the occurrence to be when Donaldson received notice of the first injury, and that was during the 1999-2000 policy period. And that's because an occurrence under the badge clause endorsement could otherwise span many years and many policy periods because these defective ducks were manufactured over a period of 10 years. So the badge clause endorsement has to say when in a specific moment of time the occurrence happened for purposes of notice, for purposes of loss of use. And so that is when the district court concluded that the occurrence happened. You don't even have to worry about what an occurrence is. It's just that's when it happened and that's what matters. Well, it doesn't matter for the purposes of this case because the occurrence doesn't trigger the policy. Okay, I see what you're saying. Yes, so it does matter for potentially other purposes. I'd like to focus on the badge clause endorsement. So first of all, talking about the first sentence, counsel for Donaldson said that the first sentence creates an occurrence of property damage. That's not what it says. It says that all property damage, and then it defines what a batch occurrence is, shall be deemed to result from a single occurrence. It's not conflating the two concepts. The badge clause endorsement maintains a distinction between the two. The occurrence causes the property damage. As to the second sentence of the badge clause endorsement, again, counsel for Donaldson referred to an occurrence of damage. That's not what the last sentence says. It says such an occurrence will be deemed to occur with the first injury. It doesn't say such an occurrence of damage. And I think it's important for the court to understand that it's not just in complex environmental cases that there is a difference between an occurrence and property damage. I mean, even if you go back to SINGSAS, one of the fundamental Minnesota Supreme Court decisions on this distinction between an underlying occurrence and property damage that triggers a policy, in that case it was a defectively designed man lift. And it didn't fail until years later, and that's when an individual was injured. So again, you have a discrete event, the occurrence. Here, the discrete event is theoretically the manufacturer of these defective air ducts, which are deemed to have occurred with the first injury notified to Donaldson, which is 1999-2000 policy period. But it results in injury. In SINGSAS, it results in an individual being physically injured. In this case, that batch occurrence, the defectively designed air ducts that are deemed to have occurred during the 1999 policy period result in injury during at least five separate policy periods. And that is when the trucks are damaged. So this is a run of the mill. I don't think it's nine times out of ten that the two overlap. But to the extent that there are some cases where they overlap, that might be why there's some confusion or there's sometimes a lack of clarity when people are speaking about an occurrence as to whether it's the underlying event or the resulting property damage. But it is clear in these policies what it is. With that, we ask that the court reverse the district court's interpretation of the policies and remand with instructions to allocate the damage across each policy period in which was triggered by property damage and with instructions to apply an objective definition of the term lot, which results in a minimum of four occurrences. Thank you. All right. Thank you very much, counsel. We appreciate your argument. I submit the case is submitted. Does that conclude the calendar for the morning? It does, Your Honor. Very well. The court will be in recess until 9 o'clock tomorrow morning.